NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0315n.06
Filed: May 1, 2009

No. 08-1281

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JERRY VANDIVER,

      Plaintiff-Appellant,

          v.

CORRECTIONAL MEDICAL SERVICES, INC.;
CRAIG HUTCHINSON, Senior Medical Regional
Director for CMS Specialty Clinics; MARK WEST,
Health Unit Manager at Chippewa Correctional
Facility,

      Defendants-Appellees.

On Appeal from the United
States District Court for the
Western District of Michigan
at Grand Rapids

_____/

**Before:** **GUY, ROGERS, and GRIFFIN**, **Circuit Judges.**

**RALPH B. GUY, JR.**     Plaintiff Jerry Vandiver, a pro se Michigan prisoner, appeals from the dismissal of his claims in their entirety for failure to exhaust his administrative remedies as required by the Prisoner Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a). Plaintiff contends that the district court erred in concluding that he had not adequately exhausted his administrative remedies, in finding that he had not objected to the denial of his motion for leave to amend his complaint, and in denying his motion for

reconsideration.[1]  After review of the record, we affirm in part, reverse in part, and remand for further proceedings.

## I.

Plaintiff, an insulin-dependent diabetic, filed this action in July 2006 against defendants Correctional Medical Services, Inc. (CMS); Craig Hutchinson, M.D., Senior Regional Director for CMS Specialty Clinics; and Mark West, R.N., the Health Unit Manager (HUM) at the Chippewa Correctional Facility.  The complaint alleged that CMS, which contracted with the Michigan Department of Corrections (MDOC) to provide medical services, adopted a policy and custom of cutting costs by delivering substandard medical care to prisoners by, among other things, limiting offsite referrals, orthopedic shoes, and diabetic diets.  Plaintiff also claims that the MDOC implemented a policy in 1997 that allocated the cost of "true" orthopedic shoes to health care, while shifting the cost of other recommended shoes to the MDOC institution.

Apart from these allegations of policy and custom, plaintiff asserted claims based on the denial of specialty shoes recommended by podiatrist Dr. Matthew Page in February 2001, and the resulting amputation of two toes on his right foot in November 2002.[2]  Plaintiff specifically alleged that the recommendation was faxed to Dr. Hutchinson, CMS's Senior Regional Director, who disapproved it despite his personal knowledge of plaintiff's condition

---

[1]The district court found plaintiff's objections were not timely and that the untimely objections did not demonstrate error with respect to the motion to amend.  No further arguments are made on appeal.

[2]Although the complaint alleged that the surgery occurred in November 2001, plaintiff stated that this was an error and that the partial amputation of his right foot occurred in November 2002.

from having previously treated plaintiff. Plaintiff claimed that he was informed on February 13, 2001, by RN King and HUM Susan DeBruyn that "a doctor" had reviewed the recommendation and disapproved the specialty shoes. Plaintiff grieved the denial in 2001, which was denied at all three steps, and filed a § 1983 action arising out of these facts. That suit was dismissed on several grounds, including that King and DeBruyn were not served, and for failure to exhaust administrative remedies with respect to CMS and other defendants who were not named at each step of the grievance procedure. *Vandiver v. Martin*, 304 F. Supp. 2d 934, 943 (E.D. Mich. 2004).

Plaintiff has also asserted that CMS, Hutchinson, and West discontinued and denied his request for a special diabetic diet in early 2006, resulting in high and low blood sugar levels, blurred vision, and further future amputation. This, plaintiff alleged, was pursuant to a policy of limiting medical care that resulted in deliberate indifference to his serious medical needs. He also claimed that it violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq., since a white prisoner who also had poorly controlled insulin-dependent diabetes had been approved for a diabetic diet and transfer to a facility with a dietician. Finally, plaintiff alleged that West told him he was being denied medical treatment in retaliation for having filed another lawsuit against West's friend, Chief Medical Director George Pramstaller, and other medical personnel.

After plaintiff commenced this action in July 2006, CMS and Hutchinson moved to dismiss, and West filed a separate motion to dismiss or for summary judgment. Plaintiff filed responses to defendants' motions, and sought leave to amend the complaint to add new

parties. The magistrate judge denied leave to amend, and recommended that defendants' motion be granted. On January 9, 2008, over plaintiff's objections, the district court adopted the report and recommendation, granted the defendants' motions, and dismissed plaintiff's claims for failure to properly exhaust his administrative remedies. This appeal followed.

## II.

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory, and applies to suits with respect to prison conditions regardless of the type of relief sought. *Booth v. Churner*, 532 U.S. 731, 739 (2001); *Porter v. Nussle*, 534 U.S. 516, 520 (2002). Although this court required otherwise at the time this case was filed, it is now clear that a prisoner may not be required to specifically plead or demonstrate exhaustion in his complaint. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007). Rather, a prisoner's failure to exhaust under § 1997e(a) is an affirmative defense on which the defendant bears the burden of proof. *Id*.

Interpreting the PLRA to require "proper exhaustion," the Supreme Court explained that "proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). As the Court in *Jones* explained, "[t]he level of detail necessary in a grievance

to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." 127 S. Ct. at 922-23. As a result, since the MDOC policy in effect when the grievance was filed in *Jones* did not specify who must be named in a grievance, it was error to have imposed a "name all defendants" requirement for exhaustion in that case. *Id*. (MDOC Policy Directive 03.02.130 (eff. Nov. 1, 2000)). Of course, it is the grievance procedure that determines the requirements, and the MDOC has revised its procedures to require, in part, that: "Information provided shall be limited to the *facts* involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." MDOC Policy Directive 03.02.130, ¶ T (eff. Dec. 19, 2003).

## A. MDOC Policy

The framework of the MDOC grievance policy, under both the 2000 and 2003 versions, requires the grievant to attempt to resolve the issue with the staff member before pursuing a grievance through the three-step process. Specifically, a grievant must attempt to resolve the issue within two business days of becoming aware of a grievable issue, unless prevented by circumstances beyond his control. *Id*. at ¶ R. If that complaint is not resolved, a Step I grievance may be filed using the specified form. *Id*. If the grievant is dissatisfied with the response, or does not receive a timely response at Step I or II, he may appeal to Step II and III, respectively. *Id*. Time limits are established for the Step I, II, and III grievances, as well as for the MDOC's responses.

"Prisoners . . . are required to file grievances in a responsible manner." *Id*. at ¶ G. A Step I grievance is received by a Grievance Coordinator, who is to determine whether the grievance should be rejected. *Id*. at ¶ Y. A grievance must be rejected if, among other things, it contains profanity or threats of physical harm that are not essential to a description of the grieved behavior, and *may* be rejected for other reasons, including that it is untimely and there is no valid reason for delay; that the grievant did not attempt to resolve the issue before filing a grievance; or that the grievance is "vague, illegible, contains multiple unrelated issues, or raises issues that are duplicative of those raised in another grievance filed by the grievant." *Id*. at ¶ G.

## B.    CMS and Hutchinson

Defendants CMS and Hutchinson argued that plaintiff failed to exhaust his administrative remedies with respect to the claims based on the refusal to approve the recommended shoes in February 2001, and the resulting partial amputation of his right foot in November 2002. With the initial complaint, plaintiff identified and attached copies of grievances filed on September 26, 2005 (URF 0590 1880 12I) ("1880") and February 20, 2006 (URF 0602 0437 12H) ("0437"). Defendants established that these grievances were not properly exhausted because they failed to comply with applicable MDOC grievance procedures.

The first of these ("1880"), dated September 26, 2005, named CMS and Hutchinson in the Step I grievance and claimed that the failure to approve and provide specialty footwear recommended by Dr. Page in February 2001 led to the infection and amputation of two toes

on his right foot. The Step I response indicated both that the issue was not timely as the concern spanned greater than five years, and that plaintiff was provided accommodative footwear in April 2001. In the Step II appeal, the MDOC reiterated the Step I response. The Step III denial concluded both that the grievance was not filed timely and that plaintiff had received appropriate medical care. Where the grievance is denied alternatively on the merits and for failure to comply with critical grievance procedures, a later action will be subject to dismissal for failure to properly exhaust under *Woodford*. *See Grear v. Gelabert*, No. 07-cv-203, 2008 WL 474098, at * 2, n.1 (W.D. Mich. Feb. 15, 2008) ("A state is, of course, always free to reject a grievance both for failure to properly comply with available procedures *and* on the merits. . . . As long as the 'procedural default' rejection is clear, a subsequent § 1983 claim based on the grievance will be subject to dismissal for failure to properly exhaust.").

Plaintiff argued in the district court that the grievances were not untimely because he did not know of CMS's or Hutchinson's role in setting policy or reviewing requests until September 22, 2005, when another prisoner showed him an affidavit from another case in which Hutchinson identified himself as the Senior Regional Medical Director for CMS. The district court found that it was not required to accept this allegation because it was "patently and incontrovertibly false." Indeed, as the district court noted, plaintiff filed an earlier action arising out of these facts against CMS and other defendants. *Vandiver*, 304 F. Supp. 2d at 943. Although plaintiff avers that the September 2005 grievance was an attempt to finally exhaust this claim against CMS, this misses the point that proper exhaustion still requires

compliance with the grievance policy's critical procedures such as timeliness. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) (stating that dismissal for failure to exhaust is without prejudice and does not bar the reinstatement of the suit, unless it is too late to exhaust).

Making a somewhat different argument with respect to Hutchinson, who was not a defendant in the earlier lawsuit, plaintiff claims that defendants "concealed" Hutchinson's identity as the doctor who denied him the recommended shoes in 2001. The district court found from the averments in the complaint, however, that plaintiff clearly knew of Hutchinson's involvement in his medical care and referred to him as his treating physician. The allegation actually was that when Hutchinson, as CMS's Regional Director, denied plaintiff the recommended shoes, Hutchinson already had personal knowledge of plaintiff's condition because Hutchinson, as an MDOC employee, had previously treated plaintiff. Nonetheless, plaintiff also alleged in the complaint that "Dr. Page told Plaintiff he faxed [the recommendation for special shoes] to the Defendant CMS's Senior Regional Medical Director Dr. Craig Hutchinson." It follows that the district court did not err in finding that it was plain from the plaintiff's pleadings that Hutchinson's identity had not been concealed.

The other grievance ("0437"), dated February 20, 2006, claimed that CMS and Hutchinson implemented a policy and custom of providing substandard medical care, repeating the allegations regarding the MDOC's 1997 memoranda concerning orthopedic and other soft-soled shoes and the MDOC's 2000 contract with CMS to provide medical services. The MDOC denied the grievance at Step I for several reasons, including that on the "date of

incident" identified as February 15, 2006, plaintiff's foot was evaluated by a nurse who referred him to a medical service provider on an urgent basis. In addition, the Step I response indicated both that the grievance was a duplicate of the first one ("1880"), and that concerns relating back to 1997 were not timely. Denied for the same reasons at Step II, the grievance was rejected as duplicative of the earlier grievance at Step III. Plaintiff argued that this grievance was an attempt to separately grieve the alleged policy and custom, as opposed to Dr. Hutchinson's personal involvement, but the district court did not err in finding that the this grievance duplicated the earlier one and was not properly exhausted.

Finally, plaintiff also alleged in the complaint that he grieved this claim in 2001. The district court acknowledged, in light of *Jones*, that plaintiff was not required to name every defendant to properly exhaust at the time the 2001 grievance was filed. Nonetheless, the court also found that the 2001 grievance did not exhaust these claims because it failed to give the defendants fair notice that the grievance was directed against them. In dismissing CMS from the earlier suit, the court found the 2001 grievance mentioned CMS but did not indicate that CMS was a party against whom plaintiff presently had a grievance. *Vandiver*, 304 F. Supp. 2d at 944. Also, the 2001 grievance specifically grieved the actions of King and DeBruyn without addressing the claim being made against Hutchinson. The district court did not err in finding that the claims at issue were not properly exhausted by the 2001 grievance.

## C.    West

West argued that plaintiff failed to exhaust his administrative remedies with respect to his claims that he was denied a diabetic diet and appropriate medical care. Defendants

argued that two grievances identified by plaintiff, filed on February 20, 2006 (URF 06-02-0438-12H) ("0438"), and on February 26, 2006 (URF 06-02-0476-12I) ("0476"), failed to properly exhaust these claims.

In the first of these ("0438") plaintiff claimed that, on February 15, 2006, West told him that his diabetes was poorly controlled but refused plaintiff a medical transfer to a facility where he could receive a diabetic diet. The Step I grievance also stated that plaintiff had proved that a white prisoner whose insulin-dependent diabetes was also poorly controlled was given a diabetic diet and transferred to a facility with a dietician. The MDOC denied the grievance at Step I because (1) West was not at the facility on the February 15 incident date and denied having the alleged conversation with plaintiff; (2) plaintiff did not make a legitimate attempt to resolve the issue since the February 15 encounter; and (3) a prisoner's need for a special diet is in the discretion of the Medical Service Provider who had not determined that plaintiff's needs could not be met at the Chippewa facility. Denying the Step II appeal, the MDOC indicated that the nurses responded appropriately to plaintiff's requests and that plaintiff's grievance lacked factual credibility. The grievance was denied at Step III because West was not at the facility on the date of the incident and denied having the alleged conversation with plaintiff. Defendant persuaded the district court that the grievance was not properly exhausted because it was rejected for failure to comply with critical procedural requirements. However, that is not evident from the Step I, II, and III responses, which appear instead to deny the grievance on the merits because West was not present on the day in question and because plaintiff received appropriate care.

Defendant also argued that the grievance was not properly exhausted because plaintiff did not attempt to resolve the issue before filing the grievance, which stated the date of incident as February 15, 2006 and indicated "Jan/Feb 15, 06" as when he attempted to resolve the issue. Reasoning that plaintiff could not attempt to resolve an issue before it happened, the district court concluded that plaintiff failed to comply with grievance procedure. It is not clear from the MDOC's responses that the grievance was denied for this alleged procedural default. The Step I response stated: "It should be noted the patient has not made a legitimate attempt to resolve his issue since the February 15th encounter when he was evaluated by nursing for callus formation." Nor is it clear that no attempt was made since the grievance averred that plaintiff had attempted to resolve the issue several times and had been instructed to re-write the grievance to leave out the white prisoner's name and medical information. It was error to conclude that this grievance failed to properly exhaust the claim against West concerning the denial of his request for a diabetic diet.[3]

The judgment is **AFFIRMED in part and REVERSED in part,** and the claims against West regarding the denial of a diabetic diet are **REMANDED** for further

---

[3]The last grievance ("0476") filed on February 26, 2006, listed February 19 and 24, 2006, as the date of incident, but alleged generally that plaintiff continued to suffer pain from the partial right foot amputation, that the physician's assistant refused to properly treat his injuries, that he was denied an influenza vaccination, and that the above denial of medical treatment was in retaliation for a lawsuit he filed against the Chief Medical Director and other medical personnel. The Step I response indicated that the grievance was a duplicate of grievances "0437" and "1880" and denied the grievance on the merits because there was no entry in the health record for the dates listed, the allegations against West were untrue, and diabetic patients did not fit the criteria for the influenza vaccination. Plaintiff's appeal to Step II was denied on the merits, and the grievance was rejected at Step III as vague with respect to the denial of care, for raising multiple unrelated issues, and for the reasons given at Step I and II. The district court did not err in finding that the grievance did not properly exhaust the claims regarding the denial of treatment or a diabetic diet because the grievance was vague and raised multiple unrelated issues.

proceedings.